IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 06-00198 SOM |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART BRUNN'S |
| vs. | ) | MOTION TO SUPPRESS; ORDER |
| | ) | DENYING TERRAGNA'S MOTION TO |
| KEVIN BRUNN (05); | ) | SUPPRESS |
| MICHA TERRAGNA (06), | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

ORDER GRANTING IN PART AND DENYING IN PART BRUNN'S MOTION TO
SUPPRESS; ORDER DENYING TERRAGNA'S MOTION TO SUPPRESS

I.      INTRODUCTION

        Defendants Micha Terragna and Kevin Brunn have filed

separate motions to suppress evidence (Docket Nos. 130 and 132),

claiming their Fifth Amendment rights were violated when they

were not informed of their Miranda rights before what they say

were custodial interrogations.  The court grants Brunn's motion

in part and denies it in part.  The court suppresses the

statements Brunn made contemporaneously with the search of his

person pursuant to a search warrant.  The court denies the

remainder of his motion, and denies in full Terragna's motion to

suppress.

II.     FINDINGS OF FACT

        This court received oral testimony on February 7, 2008.

In an effort to rule promptly on the merits and to avoid the

burden on the court's over-extended court reporters, the court

did not request and therefore does not have final transcripts of

the live testimony, although the court has reviewed "rough"
unedited copies of those transcripts.  Therefore, in referring to
that testimony in these findings of fact, this court is unable to
give exact page and line citations to the testimony.  Based on
the live testimony and the exhibits received in evidence, the
court finds the following by a preponderance of the evidence.

      A.    Special Agent ("S.A.") Michael McDonald,
S.A. Jason Cherry, S.A. Ty Cook, S.A. Patrick O'Brien, and
Honolulu Police Department Deputy Chief Michael Tucker testified
on behalf of the Government.  All of the Government's witnesses
testified credibly.  In particular, S.A. McDonald appeared to the
court to be consistently taking great care not to overstate what
he remembered, conceding even things possibly unfavorable to the
Government.  For example, although McDonald testified that, when
the officers arrived at the Brunn/Terragna residence to execute
the warrants, a third person was in the front of the house,
McDonald admitted that he did not remember whether that third
person did or did not remain at the property until the agents
left.  McDonald also readily admitted that someone might have
told Brunn and Terragna that they were not to stand together
while the agents conducted the searches.  When the court asked
McDonald to be specific about whether he told Brunn and Terragna
whether they were free to leave, McDonald did not exaggerate what

he had said to them.  McDonald's care and attention to accuracy leads the court to greatly credit his testimony.

B.    Daniel Gomes and Patrick Kawai testified on behalf of Brunn and Terragna.  The court does not doubt that both witnesses were trying to accurately state what occurred on May 31, 2005.  Gomes's memory of those events, however, appears to be somewhat clouded.  At times, Gomes gave a very detailed description of the facts.  For example, Gomes was able to testify with considerable precision about the number of feet a person was away from him.  At other times, however, Gomes inexplicably could not remember any details whatsoever.  For example, Gomes could not remember anything about the appearance of the law enforcement officials he saw on May 31, 2005.  Gomes also seemed prone to exaggeration and dramatization, although the court has no reason to think that was deliberate on his part.  He was the only witness who dramatically testified that law enforcement officials entered the property with the muzzles of rifle-type guns pointing upwards, and the only witness who claims that Brunn's arm was forcefully held behind his back.  Kawai, who was closer to Brunn at the time, noted no such action.  For his part, Kawai said Terragna was forcefully frisked, calling that action a "mugging." The court does not doubt the sincerity of Kawai's testimony, but questions its accuracy in light of Gomes's failure to note a "mugging," even though Gomes was far closer to Terragna at the

3

time.  In short, while the court does not think Gomes or Kawai was lying, the court discounts the accuracy of some of their recollections.   This is particularly so when the testimony of one of the two seems implausible when compared with the testimony of the other.

          C.   On March 31, 2005, Magistrate Judge Barry M. Kurren signed a search warrant for the person of Kevin Brunn, his residence, located in Waipahu, Hawaii, and his 2000 black Chevrolet SUV.[1]  See Search Warrant, Misc. No. 05-0232, of which this court takes judicial notice; Testimony of S.A. Michael McDonald.  At the same time, Magistrate Judge Kurren signed a search warrant for the person of Brunn's then-girlfriend (now wife) Micha Terragna and her residence, which was the same as Brunn's.  See Search Warrant, Misc. No. 05-0233, of which this court takes judicial notice; McDonald Test.  The FBI wanted to

---

[1]Because Terragna's Motion (Docket No. 130) and the Government's Opposition and Exhibits (Docket No. 143) contain personal information (addresses and social security numbers), the Clerk of Court is ordered to immediately seal those documents. No later than five working days from the date this Order is filed, counsel for Terragna and counsel for the Government are ordered to file new versions of those documents with this court, with the personal information redacted from the body of the documents, as well as from the exhibits.  Counsel for Terragna and the Government should attach to the redacted documents a cover sheet indicating what type of information was redacted from the document and/or exhibits, as well as identifying the corresponding sealed document.  This process furthers one of the goals of the E-Government Act of 2002, Public Law 107-347, Section 205(c)(3), and protects the public's right of access to this court's files.

search for documents related to chicken-fighting operations, to
examine and search Brunn's and Terragna's cell phones, and to
collect evidence of payment(s) of money to them from John
Saguibo.  The search warrants allowed law enforcement officials
to search all other motor vehicles located at the residence at
the time of the search.  See Search Warrants, Misc. Nos. 05-0232
and 05-0233.

          D.   On March 31, 2005, Brunn was an officer with the
Honolulu Police Department.  Testimony of Deputy Chief Michael
Tucker.  Brunn and Terragna were being investigated in connection
with a chicken-fighting gambling operation.   See McDonald Test.

          E.   On the afternoon of March 31, 2005, as part of
their investigation of the gambling operation, agents had been
following John Saguibo.  The Government had evidence from a
wiretap tying Saguibo to a chicken-fighting gambling operation.
Agents saw Saguibo driving to the Brunn/Terragna residence.
After Saguibo left the residence, agents arrested and questioned
him.  Saguibo told them he had just dropped off a package at the
Brunn/Terragna residence.  See id.

          F.   Ten law enforcement agents then went to Brunn and
Terragna's house to execute the warrants.  These law enforcement
personnel included an eight-person FBI search team led by S.A.
McDonald, who at that time had been an FBI agent for 2 years and
9 months.  Also present were a female FBI analyst, Susan Ogawa,

and Honolulu Police Department Assistant Chief, now Deputy Chief,
Michael Tucker.  Ogawa and Tucker did not participate in the
execution of the search warrants.

       G.   Tucker was present at the FBI's request because
Brunn was an HPD officer and in possession of a firearm.  The FBI
thought that the presence of an HPD official like Tucker and a
statement by that official that the people coming onto Brunn's
property were law enforcement officials might make it more likely
that Brunn would respond peacefully.  See McDonald Test.; Tucker
Test.

       H.   The search team arrived at the Brunn/Terragna
property at approximately 6:05 p.m.  As the team approached the
residence, some of the FBI agents had their handguns in holsters,
some had their handguns out and pointed at the ground, and some
had semi-automatic rifles pointed at the ground.  See McDonald
Test. (indicating that some of the agents had their weapons
drawn); Testimony of Jason Cherry (stating that he initially had
his handgun drawn, but that he reholstered it); Testimony of
Patrick O'Brien (indicating that he had a M4 Carbine semi-
automatic rifle with its muzzle pointing downward); Testimony of
Patrick Kawai (indicating that the officers had handguns in their
holsters and long guns, which he identified as MP5s, with their
muzzles pointed at the ground); but see Testimony of Daniel Gomes

(indicating that the officers had rifles with their muzzles pointed in the air, as well as handguns).

I.   Brunn and Terragna were in the front of the house, near the carport area.  As S.A. McDonald and then-Assistant Chief Tucker approached the gate to the property, S.A. McDonald told Brunn and Terragna that he had search warrants, that neither Brunn nor Terragna was under arrest, and that neither would be in custody when law enforcement personnel left. Although he may have thought that the import of his statement was that Brunn and Terragna would be free to leave while the house was searched, S.A. McDonald did not remember whether he expressly told Brunn and Terragna that at that time.   Brunn and Terragna were shown the search warrants and given a chance to read them. See McDonald Test.; Cherry Test.

J.   It is undisputed that neither Brunn nor Terragna was read or told of Miranda rights at any time during the execution of the search warrants.  See McDonald Test.

K.   It is unclear who opened the gate.  See, e.g., McDonald Test. (indicating that someone opened the gate).  The gate was, however, opened, and then-Assistant Chief Tucker spoke with Brunn for 30 seconds to one minute.  See id.  Tucker told Brunn that the agents had a warrant, that he had read the warrant, and that it appeared valid.  Tucker told Brunn to "be cool" and to cooperate with the warrant.  See Tucker Test.

Tucker said he did not tell Brunn to otherwise cooperate with the FBI or to answer the FBI agents' questions.  Tucker also said he did not tell Brunn that Brunn could be fired if he failed to answer the agents' questions.  <u>See</u> <u>id.</u>  Having observed Tucker on the witness stand, this court found Tucker highly credible.

          L.    Patrick Kawai, who lives near Brunn, was at Brunn's home helping install some windows when the agents arrived.  Kawai says he overheard a Honolulu Police Department officer, presumably Tucker, tell Brunn, "You will cooperate with this investigation fully."  <u>See</u> Kawai Test.  While Kawai appeared to this court to be truthfully relating his perception of the events, he may not have been in a position to clearly apprehend what Tucker said to Brunn.  Kawai testified that he was approximately 8 to 10 feet from Brunn.  Kawai said he did not hear that officer tell Brunn to "Be cool" or that he had reviewed the warrant and that it appeared valid.  <u>Id.</u>  The accuracy of Kawai's recollection about cooperation is therefore in doubt.

          M.    While Tucker was speaking with Brunn, Terragna was directed to stay near the fence in the front yard.  Gomes, who lived next door and came out of his house to see what was going on at the Brunn/Terragna home, testified that an agent told Terragna to "stay here."  <u>See</u> Testimony of Daniel Gomes.

          N.    While Tucker was talking with Brunn, Brunn may or may not have been frisked.  <u>See</u> McDonald Test. (stating that he

did not frisk Brunn); Cherry Test. (stating that he did not touch
Brunn, but that he saw S.A. McDonald pat down Brunn); Testimony
of Ty Cook (noting that he did not remember McDonald patting down
Brunn); Tucker Test. (stating that, as he was talking to Brunn,
S.A. McDonald patted down Brunn's front pants pockets).  S.A.
McDonald says that he merely asked Brunn to lift his t-shirt so
that he could see if Brunn had a weapon in his waistband.  S.A.
McDonald asked Brunn where Brunn's service handgun was located,
and Brunn told McDonald that it was in his truck.  Both S.A.
McDonald and S.A. Cherry told Brunn not to go near Brunn's truck.
See McDonald Test.; Cherry Test.  Brunn was not handcuffed and
was, at that time, in the front-lawn area near the carport.  See
McDonald Test.

        O.   At approximately 6:10 p.m. on March 31, 2005,
agents announced something to the effect of "FBI, FBI, we're
coming in" and entered the house.  S.A.s McDonald, Cherry, and
Cook remained outside.  See McDonald Test.; O'Brien Test.  The
agents conducted a protective sweep of the house.  At
approximately 6:25 p.m., the agents concluded that the house was
"secure."  See McDonald Test.

        P.   S.A. McDonald told Brunn that, pursuant to the
search warrant, he needed to search Brunn's person.  See McDonald
Test.  It is undisputed that, until the search of Brunn's person
was completed, Brunn was not free to leave the premises.  See

McDonald Test. (indicating that, until the agents seized items
from Brunn's person, McDonald would not have let Brunn leave the
premises); Cherry Test. (indicating that before Brunn was
searched, Brunn was not free to leave).  S.A. McDonald told Brunn
that, after he was searched, he would be free to leave or stay so
long as he did not interfere with the search.  See McDonald
Test.; Cherry Test.  Brunn told McDonald that he wanted to stay.
See Cherry Test.

          Q.  S.A. McDonald told Brunn that McDonald knew that
Saguibo had dropped off money.  McDonald told Brunn that he
needed to find the money and Brunn's cell phone, and that it
would be easier if Brunn would just hand them over, rather than
making the agents search for them.  Brunn then took $820 in cash
and his cell phone out of his pants pockets and handed the items
to McDonald.  Had Brunn not been cooperative, McDonald would have
physically searched Brunn pursuant to the warrant and would have
found the cell phone and the money.  See McDonald Test.

          R.  S.A. McDonald talked to Brunn for about three
minutes.  Upon receiving the money, McDonald asked Brunn whether
there was an envelope.  Brunn said no.  After the agents counted
the money that Brunn handed them, McDonald asked whether the
money was what Saguibo had recently delivered and whether it was
everything delivered.  Brunn said that it was. Brunn also said
that the money Saguibo had given him was for chickens that had

been bought and that were to be trained for chicken fights.   <u>See</u>
McDonald Test.

   S.   While McDonald was searching Brunn, Terragna was
on the front lawn.  At some point, she was standing near the
fence between her yard and Gomes's property.  Gomes and Kawai
recall that Terragna was holding her 10 month-old-baby, Keilim,
when the agents arrived on her property.  <u>See</u> Gomes Test.; Kawai
Test.  By contrast, none of the agents remembered seeing Terragna
holding anything.

   T.   Gomes was particularly definite in his
recollection.  He seemed to have a close relationship with Brunn
and Terragna, as their son, a toddler at the time, was in the
Gomes home when the agents arrived at the Brunn/Terragna
property.  <u>See</u> Gomes Test.

   U.   According to Gomes, while Terragna was standing
in her yard,  Terragna asked one or more agents whether she could
hand her baby over the fence to Gomes, who was standing on his
side of the fence observing what was happening on his neighbor's
property.   The agents allowed that, and Keilim was handed to
Gomes over the fence.  Gomes said this occurred about fifteen
minutes after the agents arrived at the property.  <u>See</u> Gomes
Test.

   V.   After McDonald completed his search of Brunn,
McDonald walked over to Terragna, while Brunn went to the

carport.  McDonald told Terragna that she was not under arrest, but that the agents needed to search her pursuant to the search warrant.  McDonald says that, because they did not have any female agents present (a female FBI analyst was present but was not trained to do searches), the agents did not frisk Terragna. See McDonald Test.  McDonald says that he merely asked Terragna to remove her windbreaker, and that he was satisfied from a visual search of her that she was not concealing any weapons. McDonald said at most he may have lifted Terragna's shirt so that he could see her waistline.  See McDonald Test.  S.A. Cherry's recollection was that neither he nor McDonald touched Terragna. See Cherry Test.

W.   Kawai, a State of Hawaii deputy sheriff, testified otherwise.  According to Kawai, an agent "mugged" Terragna as she stood backed up against the fence in her yard. At the hearing, Kawai demonstrated what he meant by "mugging." His demonstration indicated that someone placed hands on Terragna and made circular motions around the front of her body to feel what she may have had under her clothing, then encircled her body as if in a hug to feel the back of her torso.  See Kawai Test. Kawai recalled that Terragna had on her windbreaker at the time.

X.   What was never explained was Gomes's failure to see the "mugging" that Kawai described.  Gomes was standing on his side of the very fence that Kawai says Terragna was backed up

against.  Gomes testified that he was close enough to hear an
agent tell Terragna to "stay here."  Under those circumstances,
Gomes should have seen any "mugging," yet he testified to no such
thing.

Y.   McDonald says that, in addition to giving him her
windbreaker, Terragna gave him her cell phone.  See McDonald
Test.  Although Terragna was apparently talking the whole time,
acting compliant and friendly, no party introduced any evidence
as to what she said during her interaction with McDonald, which
lasted just a couple of minutes.  See id.  Nor is there any
evidence that McDonald or any agent asked her anything.

Z.   McDonald's search of and conversations with Brunn
and Terragna occurred during the 6:10 to 6:25 p.m. period in
which the agents were conducting the protective sweep of the
house.  After he had searched Brunn and Terragna pursuant to the
warrants, McDonald would have preferred to have Brunn and
Terragna leave, so that they did not interfere with the search of
the house that followed the protective sweep.  At some point, he
reminded them that they could leave, although he could not recall
whether, right after their persons were searched, he expressly
told them they were "free to leave."  McDonald did tell them
that, until the agents were done with the initial protective
sweep of the house, Brunn and Terragna could not enter it.  See
McDonald Test.; Cherry Test.

AA.   Kawai said he was told to sit near Brunn in the carport.  He did not hear Brunn tell the agents anything about wanting to leave or stay.  Instead, Kawai was under the impression that neither he nor Brunn could leave, and Kawai said he and Brunn sat in the garage for the two hours or so it took the agents to complete all of their searches.  Kawai recalled asking for permission to use the bathroom.  <u>See</u> Kawai Test.

BB.   Gomes also thought Brunn had to stay put.  He said he overheard agents tell Brunn to "stay here."  <u>See</u> Gomes Test.  Gomes also said he saw an agent restrain Brunn by holding Brunn's arm behind his back.  Notably, Kawai, who was closer to Brunn than Gomes was, saw no such thing.  No agent testified that Brunn's arm was held behind his back.  <u>Compare, e.g.</u>, Cherry Test. (indicating that Brunn was not restrained), <u>with</u> Gomes Test. (indicating that Brunn was restrained with his arm behind his back).  Even though Gomes may have been sincere in stating his recollection, the court cannot help but question the accuracy of his recollection.

CC.   Besides the infant that Terragna handed over the fence to Gomes and the toddler that was at Gomes's house, Brunn and Terragna had a third child, a daughter, Keisha, who was a preteen or a teenager.  Keisha was at a park, and, at some point while the agents were executing the search warrants, was supposed to be picked up.  While Terragna was in her yard, the phone rang

14

two to three times.  See Gomes Test.; Kawai Test.; Cherry Test. This caused Terragna to tell one or more agents that her daughter was calling and needed to be picked up.  Gomes says he overheard an agent tell Terragna that she could not leave.  Id.  Appearing to be quoting the agent's exact language, Gomes spoke in a local vernacular unlike the speech used by the agents who testified. While there were other agents at the house, the court has no evidence that any agent would have used the vernacular that Gomes used.

DD.   Kawai said that Brunn also told agents he wanted to pick up his daughter but was told that he could not leave. See Kawai Test.; see also Cherry Test.  While the timing is unclear, Gomes and Kawai appear to have been describing conversations that occurred fairly early during the period the agents were on the Brunn/Terragna property.  Gomes tried to estimate the timing, and his estimates suggest that the discussions about picking up a daughter occurred either around the time the search of Terragna's person was being completed, or at least before any vehicle search.  Gomes says that he agreed to pick up the girl, and an agent came onto his driveway and ordered him to go directly to the park, pick up the girl, and drive directly back.  He says he left to do that.  See Gomes Test.

EE.   After Terragna was searched, she asked and was allowed to go into the house to get milk for the ten-month-old

15

baby.  See McDonald Test.; Cook Test.  She then spent part of the time in her living room with the infant.  See Testimony of Patrick O'Brien.  However, she also freely walked in and out of the house.  See McDonald Test.; O'Brien Test.  It appears that, at some point, Gomes returned the baby to Terragna, as agents testified that they saw the child sleeping in the house at times and also being fed by Terragna in the living room.  See McDonald Test.; Cook Test.

FF.   S.A. Cook says that he was the evidence custodian for the search.  While Cook was in the house, Terragna made numerous unsolicited statements about chickens and chicken fighting.  See Cook Test.  S.A. O'Brien also reported that Terragna was very talkative.

GG.   S.A. O'Brien found a document in the kitchen. The document, received as Exhibit 3 at the suppression hearing, included a drawing of a chicken-fighting area.  At about 7:10 p.m., about sixty minutes after the start of the protective sweep, S.A. McDonald showed the document to Terragna and asked her about it.  See O'Brien Test.  Terragna's statements are summarized in Exhibit 5.  S.A.s O'Brien, Cherry, and Cook testified that most of the statements made by Terragna were made well after the search of Terragna's person was completed. Although Terragna appears to have made some statements to the agents "minutes" after her search, see Cook Test., there is no

16

evidence that Terragna was questioned while she was being searched or as the search was being completed.

III.        CONCLUSIONS OF LAW.

A.  In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court established the rule that, when a person is "in custody," procedural safeguards must be afforded that person before the person is questioned.  Otherwise, the prosecution may not use what it learns through its interrogation.  Id. at 444. This rule was premised on the Fifth Amendment's privilege against self-incrimination.  The Supreme Court reasoned that the privilege against self-incrimination is protected by adequately and effectively advising an individual of his or her rights.  See id. at 467.

B.  The initial question here is whether Brunn and/or Terragna underwent "custodial interrogation" without having been advised of their Miranda rights.  Whether they were "in custody" while being questioned by the agents turns on all the circumstances of the questioning.  The ultimate inquiry is whether there was a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983); United States v. Norris, 428 F.3d 907, 912 (9th Cir. 2005) ("A person is in custody only where there is a formal arrest or restraint on freedom of movement of the degree associated with a formal

17

arrest."); United States v. Luther, 521 F.2d 408, 410 (9th Cir.
1975) ("By 'custodial interrogation' the Miranda Court meant
questioning initiated after a person was taken into custody or
otherwise deprived of his freedom in any significant way.").

   C. "The procedural protections afforded by Miranda .
. . are designed to secure an accused's privilege against
self-incrimination and are triggered only in the event of a
custodial interrogation.  A defendant is in custody when, based
upon a review of all the pertinent facts, a reasonable innocent
person in such circumstances would conclude that after brief
questioning he or she would not be free to leave."  United States
v. Wauneka, 770 F.2d 1434, 1438 (9th Cir. 1985) (quotations
omitted); accord United States v. Hernandez, 476 F.3d 791, 796
(9th Cir.) ("An individual is in custody if considering the
circumstances surrounding an interrogation a reasonable person
felt he or she was not at liberty to terminate the interrogation
and leave." (quotation and ellipses omitted)), cert. denied 128
U.S. 265 (2007).  This is an objective, rather than a subjective
standard.  See Stansbury v. California, 511 U.S. 318, 323 (1994)
("the initial determination of custody depends on the objective
circumstances of the interrogation, not on the subjective views
harbored by either the interrogating officers or the person being
questioned"); United States v. Kim, 292 F.3d 969 (9th Cir. 2002)
(same).

D.   Facts relevant to the determination of whether a person is in custody "'include the language used by the officers, the physical characteristics of the place where the question occurs, the degree of pressure applied to detain the individual, the duration of the detention, and the extent to which the person was confronted with evidence of guilt.'"  United States v. Hernandez, 476 F.3d 791, 796 (9th Cir. 2007) (quoting United States v. Butler, 249 F.3d 1094, 1099 (9th Cir. 2001)); accord United States v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001) ("Factors relevant to whether an accused is 'in custody' include the following: (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.").

E.   California v. Beheler, 463 U.S. 1121 (1983), is instructive here.  In that case, the Supreme Court held that Miranda warnings were not required.  Beheler and others had attempted to steal hashish from another person who was killed when she refused to give up the hashish.  Beheler called the police, telling them that his step-brother, Wilbanks, had killed the woman and that other acquaintances had hidden the gun used in Beheler's back yard.  Later that evening, Beheler voluntarily agreed to go to the police station, where he agreed to talk to

19

the police about the murder.  He was told that he was not under arrest and was not read his Miranda rights.  Id. at 1122.  In concluding that the police were not required to give Beheler his Miranda rights under those circumstances, the Supreme Court noted that a "coercive environment," by itself, is insufficient to convert a noncustodial situation into a custodial one.  Id. at 1124.  The Court reasoned that every interview of suspects by police officers has a coercive aspect to it.  Rather than focusing on the location of the police interview (the police station), the Court noted that "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  Id. at 1125 (quotations omitted).

          F.   In United States v. Kim, 292 F.3d 969 (9th Cir. 2002), the Ninth Circuit determined that a co-owner of a store was "in custody" for Miranda purposes when she voluntarily went to her store to check on her son, discovered a number of police cars outside of it, went into the store and had the door locked behind her, and was separated from her husband and son.  Although she voluntarily went to her store, she did not do so for the purpose of subjecting herself to police questioning.  The Ninth Circuit distinguished Beheler, noting that Beheler had voluntarily gone to the police station with the understanding that he would be questioned there.  In such a situation, the

Ninth Circuit reasoned that the person undergoing voluntary
questioning would likely expect that he or she could terminate
the encounter with the police.  The co-owner of the store, on the
other hand, had no intention of subjecting herself to questioning
when she went to the store.  She was isolated from her husband
and son with the door locked behind her, and the Ninth Circuit
concluded that an objective person in that position would not
have felt free to leave.  Id. at 974-75.

        G.   The Government cites Muehler v. Mena, 544 U.S. 93
(2005), and Michigan v. Summers, 452 U.S. 692 (1981), for the
proposition that, pursuant to a search warrant, law enforcement
officials may constitutionally detain persons found on the
premises while the premises are searched.  These cases are
inapposite.  They hold that the Fourth Amendment was not violated
by the searches in issue.  Brunn and Terragna are not bringing a
Fourth Amendment challenge to the Government's detention of them
pursuant to the search warrants.  They are instead arguing that,
because they were detained, the Government violated the Fifth
Amendment by interrogating them without informing them of their
Miranda rights.

        H.   The Ninth Circuit has rejected an argument
similar to the one the Government makes here in connection with
Muehler v. Mena and Michigan v. Summers.  See Kim, 292 F.3d at
976 ("whether an individual detained during the execution of a

21

search warrant has been unreasonably seized for Fourth Amendment purposes and whether that individual is 'in custody' for Miranda purposes are two different issues").

I.   It is undisputed that, until Brunn and Terragna were searched pursuant to the search warrants for their persons, they were not free to leave.  See McDonald Test.; Cherry Test. Although both Brunn and Terragna were told at that time that they would not be arrested that evening, a reasonable person in their position would have felt that he or she could not leave before being searched.  The search warrants expressly allowed the agents to seize and search Brunn and Terragna.  Brunn and Terragna had no choice in the matter, and it cannot be said that either voluntarily presented himself or herself to law enforcement officials for questioning.  Certainly, no objectively reasonable person would think that, in light of the search warrants allowing searches of their person, the agents would simply allow Brunn and/or Terragna to leave the premises without first being searched.

J.   Although Brunn and Terragna were in their own front yard and had their movements restricted for a short time before the searches of their person were completed, up to eight armed FBI agents, one FBI analyst, and a Honolulu Police Department officer were on their property.  Both Brunn and Terragna were checked for weapons.  Agent McDonald told Brunn

that he needed to recover the money that Saguibo had just dropped off and told him that it would be easier if Brunn just gave him the money, rather than making McDonald search for it.  Brunn was thus confronted with evidence of his commission of a crime. Given the totality of the circumstances, this court concludes that, until Brunn and Terragna were searched, both Brunn and Terragna were in custody, as there was a restraint on their "freedom of movement of the degree associated with a formal arrest."  Beheler, 463 U.S. at 1125.

K.   The court has located no factually similar case in which a person challenged a lack of Miranda warnings in connection with the questioning of the person while a search warrant for that person was being executed.  Nevertheless, the court concludes that Brunn was "in custody" when he was being questioned by S.A. McDonald contemporaneously with the execution of the search warrant for his person.  Consistent with Ninth Circuit case law, this court concludes that Brunn was "in custody" while his person was searched because a reasonable person confronted with the totality of the facts presented that evening would not have felt free to terminate the questioning and leave while the search warrant for Brunn's person was being executed.  See Hernandez, 476 F.3d at 796; Kim, 292 F.3d at 974-75.

L.   Although the custody determination is based on an objective standard, this court's custody determination is buttressed by the agents' testimony that they would not have allowed Brunn to leave before they finished searching his person pursuant to the warrant.

M.   At the same time, or at nearly the same time, as he was searching the person of Brunn, McDonald asked Brunn questions.  The failure to give Brunn his <u>Miranda</u> rights before questioning him during the search of his person was a Fifth Amendment violation.  McDonald specifically told Brunn that agents wanted whatever Saguibo had dropped off.  When Brunn handed over $820 in cash, McDonald followed up by asking whether there was an envelope that went along with the cash.  Brunn said there was not.  After the agents counted the money that Brunn handed them, McDonald asked whether the money was what Saguibo had recently delivered and whether it was everything.  Brunn indicated that it was.  Brunn also stated that the money Saguibo had given him was for chickens that were purchased for chicken fighting.  <u>See</u> McDonald Test.

N.   Although some testimony suggested that the search was completed immediately before some of the questions were asked, the gap between the completion of the search and the questioning was so small that any reasonable person would have been unable to disentangle the questioning from the search of

24

Brunn's person.  Just as Brunn was "in custody" while his person
was searched, he was "in custody" when he answered these specific
questions and should have been provided with his <u>Miranda</u> rights.
Given the absence of any statement as to Brunn's <u>Miranda</u> rights,
these statements are suppressed as violations of his Fifth
Amendment right against self-incrimination.

      O.   However, the remaining statements made by Brunn,
purportedly set forth in Exhibit 4, are not suppressed.  Those
statements were made sufficiently after Brunn's person had been
searched that a reasonable person would have known that the
custody accompanying the search of his person had ended.  Brunn
was told that he did not have to stay on the premises while the
house was searched.

      P.   Even if, as Gomes and Kawai testified, Brunn was
told to stay on the premises, that direction came early in the
process.  To the extent that statement related to a request to
pick his daughter up from the park, it appears from the timing to
have related to a restraint on his freedom in connection with
either the search of Brunn's person or the search of any vehicle
that he might have needed to use to pick up his daughter.  If it
was the former, then the restraint was limited in time and ended
when the search of his person ended.  If it was the latter, then
that did not preclude Brunn from walking off his property.  The
court credits S.A. McDonald's repeated assertions that he told

Brunn as he entered the property that Brunn was not being arrested and that, after he completed the search of Brunn's person (even if not immediately after), he reminded Brunn that he could leave.

Q.   Unlike Brunn, Terragna does not appear to have been asked questions during the search of her person.  While she was indisputably in custody until the search of her person was completed, she made no statements subject to suppression until after she was searched and told she was free to leave.  Her statements were not made while she was "in custody."

R.   The court is not persuaded that the circumstances would have led a reasonable person in Terragna's position to think she was detained even after her person was searched. Terragna was allowed to converse with Gomes over the fence and to hand him her baby and then have her baby returned by Gomes to her.  She was allowed to arrange for her daughter to be picked up from the park.  She went in and out of the house, got milk for her baby, and fed her baby.  These are not the actions of someone who is detained during a search, particularly when the person has been told that she is free to leave.

S.   The statements made by Brunn and Terragna after their persons were searched are not suppressed, as neither Brunn nor Terragna was in custody after being searched, and as they were told that they could leave.

T.    Although the court is suppressing some of Brunn's statements based on a Miranda violation, the Government will be allowed to use those statements to impeach Brunn if he takes the stand and testifies in contradiction to the statements he made at the time his person was searched.  Nothing in the record indicates that his statements are unreliable.  To the contrary, it appears that his statements were voluntarily made.  Courts have held that, even when a defendant's statement is suppressed based on a constitutional violation, it is still admissible for impeachment or rebuttal if the defense offers evidence contrary to the statement.  See, e.g., Mincey v. Arizona, 437 U.S. 385, 397-98 (1978) (noting that statements taken in violation of the Fifth Amendment Miranda right are admissible for impeachment purposes if the statement is reliable); Harris v. New York, 401 U.S. 222, 225-26 (1971) (holding that the Fifth Amendment right against self-incrimination does not preclude the use of evidence obtained in violation of Miranda for impeachment purposes); Pollard v. Galaza, 290 F.3d 1030, 1033 (9th Cir. 2002) ("Although a statement, taken in violation of Miranda, may not be used substantively in the prosecution's case-in-chief, such a statement, if voluntary, may be used for impeachment should the Defendant testify inconsistently.").

U.    The court does not suppress the physical evidence obtained from Brunn, Terragna, or their residence.  That evidence

27

was obtained via the search warrants, and neither Brunn nor
Terragna has challenged the validity of the warrants.  It cannot
be said that that evidence was the "fruits" of the illegal
questioning of Brunn.  The search warrants were obtained based on
probable cause that law enforcement personnel had before Brunn
was questioned while "in custody."  The search warrants were
therefore an independent source for the evidence.  See Segura v.
United States, 468 U.S. 796, 799 (1984) ("we hold that the
evidence discovered during the subsequent search of the apartment
the following day pursuant to the valid search warrant issued
wholly on information known to the officers before the entry into
the apartment need not have been suppressed as 'fruit' of the
illegal entry because the warrant and the information on which it
was based were unrelated to the entry and therefore constituted
an independent source for the evidence") and at 805 (evidence is
not to be excluded "if police had an 'independent source' for
discovery of the evidence").  In any event, the physical evidence
obtained is also admissible under United States v. Patane, 542
U.S. 630, 643 (2004), which held that the Fifth Amendment does
not require suppression of the physical fruits of a defendant's
unwarned, but voluntary statement.  Although Brunn's statements
made during his brief custodial interrogation violated his Fifth
Amendment right against self-incrimination, those statements were
made voluntarily.

28

IV.        <u>CONCLUSION.</u>

Because Brunn was "in custody" when he was being searched and because he was not informed of his <u>Miranda</u> rights, the statements he made contemporaneously with being searched and in response to S.A. McDonald's questions during or within seconds of the search of his person are suppressed.  That is, the Government may not use at trial any of the following statements made contemporaneously with the search of Brunn's person:

> (1) Brunn's statement, in answer to McDonald's question about whether there was an envelope that went along with the money Brunn handed over, that there was no envelope.

> (2) Brunn's statement, in response to McDonald's question about whether the money was what Saguibo had recently delivered and whether it was everything, that it was.

> (3) Brunn's statement, during or within seconds of being himself searched, that the money Saguibo had given him was for chickens purchased for chicken fighting.

The court denies the remainder of the motions to suppress.  The totality of the circumstances indicates that, when Brunn and Terragna made the remaining statements discussed in

Exhibits 4 and 5, they had been released from custody and were free to leave.  Miranda warnings were therefore not required.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, February 19, 2008.



  /s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge


United States v. Brunn, et al., Cr. No. 06-00198 SOM; ORDER GRANTING IN PART AND DENYING IN PART BRUNN'S MOTION TO SUPPRESS; ORDER DENYING TERRAGNA'S MOTION TO SUPPRESS